Okay, whenever you're ready. Thank you. May it please the Court, my name is Ira Kurzban and with me is John Pratt. We're here representing ASSE International. This case is a very troubling case for a number of reasons. My client stands sanctioned for what is a very serious allegation with respect to lax oversight in human trafficking. It's hard to imagine something that's more of a stain on a company's reputation that they ignored a person who in some sense was under their care and simply looked away. In this case, it's most troubling because the facts on the full record were hidden not only from my client, but from this Court originally when this case was before the Ninth Circuit. The government intentionally ignored the Department of State, never considered it in its decision, and never brought to the attention of this Court on the first appeal that Ms. Amari, the 31-year-old program participant, was not only not involved in trafficking at all, according to diplomatic security, but in fact was a participant in the fraud that defrauded the Department of State with respect to the J-1 visa and my client in regard to what happened here. The agency acknowledges that it had disinformation from diplomatic security, but never considered it. The agency also says, and this is at Excerpt Record 30, that it never had any information about the T visa. In other words, it is just saying my client engaged in lax oversight because the T visa was issued. Had no facts about the T visa, that's what it says in the excerpt on page 30, the excerpted records. It makes it clear on this record at Excerpt Record 29, paragraph 10, and ECF, the full record, document 98 at paragraph 6, that it never considered anything that diplomatic security did, even though it had the facts. It never had that information. That's troubling because on page 271 of the excerpt, diplomatic security came to the conclusion that Ms. Amari was a willing participant in fraud. Can you just clarify one small thing? On that document you just referenced, the ER-271, what do the initials EC stand for? That is the agency that actually is involved in the sanctioning. I forget the actual title, but that's why they were present at that meeting. Okay, it's not a person, it's an entity? No, no, that is actually the agency that sanctioned my client. Okay, I see. Yeah, and Susan Geary was involved in that process, and she's named through all of the e-mails leading up to that. The purpose of this case is to impose strict liability, and I think this case shows why the imposition of reading these regulations to impose strict liability is so troubling. And it shows how absurd it would be on this record. My client was the fraud. My client, information was hidden from my client, and yet the government is standing here telling the court... ...what kinds of problems you have with any strict liability regime. So the question is whether the statute or the regulation imposes strict liability. We have strict liability in, for example, drug situations where very often both the company and the people prosecuted can say, we had no knowledge of it. Too bad. That's what we mean by strict liability. So why isn't the language of the reg is any failure by any third party to comply with the regulations set forth in this part, or with any additional terms or conditions governing exchange visitor program administration, the department may from time to time impose, will be imputed to the sponsors engaging such third parties. Your Honor, I think the answer to that question is really twofold. One is it has to be read in conjunction with 62.50A, which is the sanctioning provision. And that sanctioning provision, particularly A1, makes it clear that the sponsor had to actually do something in violation of the regulations. So one of the issues here is how you read 62.50A in conjunction with 62.22G, I guess it is, G1, and whether or not that means that there has to be some finding that it was foreseeable or at least known to the sponsor. And in this case, it was not only unforeseeable, they were defrauded. So, yes, it's true that there are regulations that provide for strict liability, whether the company knew it or not. But the reality is that, particularly in this circuit, and I would point the court to California Wilderness versus U.S. Department of Energy, 631 Fed 3rd, 1072, where there, there was the equivalent of what might have been read as strict liability. And, indeed, the government argued strict liability. The court found that you couldn't do that unless there was some way in which, given the ultimate exercise of discretion, there was a determination that could be made that it wasn't foreseeable or otherwise. Well, I understand that strict liability is something to be narrowly construed because it can result in unfairnesses, but I'm not clear why you think 62.50A changes the plain meaning of the, of G. Because the first provision, because it says we will impose sanctions against the sponsor for a violation of the regulation, it certainly implies, I don't think it's completely clear, but it certainly implies that the sponsor had to actually do something itself to warrant the sanction. And here, you know, the case law and the case law that we cited in our brief, the Amoco case particularly, and I'm sorry, I think I may have confused it, the Amoco decision, 501 Fed 2nd at 748.49. In that decision, it was a strict liability case. Amoco argued that it wasn't foreseen or foreseeable that they, or unknown, and this circuit... That was not our circuit. I'm sorry, D.C. circuit, that's right. The D.C. circuit said that you should have at least the opportunity to rebut, and that's really what we're talking about here. That is, you can have a statute that says you're responsible, we're going to impute liability, but you should also have the ability to rebut it, and particularly on the facts of this case, it demonstrates why we should have had the ability to rebut it. We had none of this information. Had we had the information, we could have pointed to the fact that Ms. Amari was not a victim. She was a fraudster. She was involved in the fraud. So there was no way that we could have known about that at the time, unless we had the information and the ability to rebut it. And so what we're saying is if you narrowly read strict liability, at least the party should have the ability to rebut it in some way, to show that it was unforeseen, unknowable, and particularly here where we were a victim of a fraud. So I think that's... I mean, I think you're somewhat conflating your two arguments, both of which you make in your brief, but one is whether they acted arbitrarily and capriciously, and I understand that argument, but I don't think that goes to the separate question of whether there is strict liability. Strict liability can exist, but that still means you have to give both sides an opportunity to be heard, etc., etc., and not act arbitrarily and capriciously. I agree with Your Honor completely, Judge Rakoff. They are separate arguments. The strict liability issue is a separate argument. All I'm saying is in order to read that or read this regulation in a fair and sensible way, you have to have the ability at least to rebut it in some sense. And I think that's what the D.C. Circuit said in Amoco, in effect, that there has to be some method in which you can rebut. The only other lingering issue I think in this case is the one of, and I think we addressed it extensively, is the issue of harmless error. Obviously, on this record, it is not harmless error given the fact that the company has to bear the stain of being charged with trafficking or in some way having lax oversight over trafficking, and that will carry with them forever if they wish to have their license extended, if there's a second charge against them. And the reason why it's particularly important here, notwithstanding the other issues, is that it's clear from the record in this case that the agency really based its decision in large part on the trafficking issue. It describes it, for example, as a grave concern in its notice of intent to impose sanctions at 151 of the excerpt record. The typical process in this kind of situation is an informal process where the agency meets with the party, because after all, a company like this company has thousands of people they're taking care of. There are things that happen. What normally happens in this situation is that the agency meets and tries to informally resolve these matters, and in fact, the legislative regulatory history at 72 FEDREG at 2114 says specifically that's what the agency should be trying to do. So... Can I ask you this? If we were to say that the, just on the harmless error point, if we were to say that the agency erred by relying upon the trafficking allegation or finding, whatever you want to call it, in light of the sort of procedural defects that you've identified, but nonetheless this letter of reprimand, because that's all it is at this point, otherwise is supported by the other two grounds, I guess I don't see why that doesn't get your client basically what you want going forward. No, no, I think that's right, and if it's remanded back, we don't know what the agency would ultimately do. We believe that the proper remedy here is to reverse the district court, remand it back with directions to the agency to have the agency not consider, or even consider all the evidence of trafficking one way or the other. But if, and maybe I misunderstood Judge Watford's question, but if the trafficking allegation doesn't have anything to do with the other findings, and if, as Judge Watford said, hypothetically we were to get that out procedurally, why did the others need to go back at all? I mean, why wouldn't we just leave those in place? Because we don't know whether or not, given the way they described the gravity of the trafficking issue, we don't know that they would do the same thing again, and in fact that's why I pointed to the regulatory history. Typically in this kind of situation, Judge Bennett, there is no sanction imposed. Typically what they would have done here is say, this person didn't speak English well enough, give us an idea or a plan about how you're going to prevent this. But I mean, if the lingering harm to your client is not the letter, but the fact that the letter deals with this trafficking as opposed to you didn't pay sufficient attention to her English-speaking ability, I mean, it's just not clear to me that even if you're right on the trafficking allegation, that it does need to get reversed and go back. Well, the reason why I'm saying that is we can't say here with certainty whether or not if the trafficking allegation is removed, whether or not the agency would then say, let's meet informally and resolve this without having any sanction. We believe that the reason why there's a sanction at all is because of the trafficking, because the other issues are typical issues that are resolved informally between the agency and the company. These issues go on all the time. And had it not been for the trafficking, we believe there would have been no sanctions. That's, I think, what I was trying to ask. So just the mere fact that a letter of reprimand was issued inflicts ongoing harm on your client, even if it's stripped of the trafficking? Of course it does, because then the next time there's a penalty, if they decide to impose a second sanction, they can take their license away. Okay. All right. You've exceeded your time, but we'll give you a couple of minutes for rebuttal. Let's hear from counsel for the defendant. May it please the court. Mike Shee for the government. The other side wants to boil this sanctions order down to the Department of State's decision to take notice that DHS granted Ms. Amari T. status. But I want to start by making clear what the Department of State's reasoning actually was. There's no dispute that on Assay's watch, Assay's third-party contractors put Ms. Amari to work in a kitchen flipping crates, despite her speaking almost no English. There's no dispute that by putting Ms. Amari in that vulnerable position, she could have had her health safety... Why are you starting there? They're not contesting that. So why are you starting there? Why don't we talk about what actually matters to the outcome of this appeal? It matters to the outcome of this appeal. No, no. I'm asking you, why don't we talk about what actually does matter, since that does not matter? Let's talk about the trafficking. So with respect to the decision to take notice of the T status, Your Honor, that was not error, and it certainly doesn't undermine... Help me understand the significance of this ER 271 document. Because I guess I came to view the interpretation that your opponent offered of this document as more in line with reality than the interpretation that you all offered in your brief. So help me understand why this doesn't, in fact, reflect a conclusion on the part of an entity within the Department of State that actually is responsible for conducting investigations in this case. Why doesn't it reflect a conclusion that actually there was no trafficking, and as your opponent said, if anything, this person was a knowing participant in fraud against our government. So I think there were two pieces to that question, and I'd like to take them both in turn, Your Honor. So as to whether there was a formal determination or not, based on the record before us and based on the representations that the State Department has given me, the Bureau of Diplomatic Security never made any formal finding one way or another. And so the ER 271 document... So help me understand what's reflected there, because I read it, and it seems to say that. So what are we missing if we look at the plain language of this document? We're missing the fact that that was just a summary of the email correspondence that was exchanged between EC on the one hand and DS on the other. Okay, so let me just read language, and you can help me interpret it. First of all, what does EC stand for in this document? I think it stands for Economic and Cultural Affairs, so I think it's the department. I could be wrong on that. All right, so I'm looking in particular at DS Honolulu asked HQ, and is HQ headquarters? HQ is headquarters, yes. Okay, that sounds important. Asked HQ if this was trafficking. HQ concluded it was not, but that visa fraud had occurred. So, Your Honor, if I could direct your attention to ER 252. Okay. So ER 252 reflects exactly that, right? So the reference to, quote, unquote, HQ concluding is a reference to, as far as I understand it, this email at the bottom of 252 carrying over to ER 253, which represents the view of one particular special agent in, you know, HQ, that what happened to Ms. Amari was not trafficking but was instead visa fraud. And that wasn't a formal conclusion of the Bureau of Diplomatic Security. And again, Your Honor, I want to reiterate that my understanding is that the Bureau of Diplomatic Security never made a determination one way or another. Okay, all right. To go to the second piece of your question, Your Honor, and this is one reason why I began the argument by referring to the Department of State's other finding. Even supposing that what the other side says is true, so even assuming that Ms. Amari was a voluntary participant in all of this, you know, the fact remains. And so was not a victim of trafficking? Even supposing that she was not a victim of human trafficking. Okay. Right. That fact does not cast doubt on the Department of State's decision to take notice of a fact in the world, namely the fact that is undisputed that the Department of Homeland Security. Well, I beg to differ on that point. Because you, or not you, but the folks who made this decision never found out what the basis for, is it USCIS or DHS? I think it's DHS through USCIS. DHS is the one that issues the visa. They never found out the basis on which that decision was made. So how could they compare the sort of weight or gravity of those facts to whatever HQ, whoever that is, whatever that is, in terms of the conclusion that was made on the DS side? It seems to me the agency had to at least say, okay, well, we did an investigation. This was even our tentative conclusion. I'll grant you that maybe there wasn't some formal conclusion. But we did an investigation. This was our preliminary finding. We have, it's a black box on the other side. We have no idea what they relied upon. So how could it rationally make a decision to credit this other agency's finding over its own preliminary finding? That's what I guess I don't understand. I understand your question, Your Honor. Again, I want to try to offer two responses to that. The first is, again, my understanding is that it's quite hard, in fact, to obtain these records from a separate agency. Because there might be some protections accorded that information. So, you know, although I'm not sure that may explain one reason why the Department of State did not have those records from another agency in front of it. But going to the other part of your question, which is whether it had to under the APA, whatever happened, and even accepting the other side's version of events, does not undermine the reasonableness of what the Department of State ultimately sanctioned S.A. for. We have no way of making an assessment of your claim to that. Because there's, well, we don't know what's in the black box. And moreover, the agency doesn't. So I don't see how an agency could rationally explain to us that, listen, we looked at all this. Here are the reasons why we credited this agency's finding over our own. And, you know, had there been an explanation for that, I'm the first to say, yeah, of course we would defer to that. We're not here to second-guess the agency's decision-making on that front. But I guess I don't feel like I have any insight whatsoever into how the agency rationally came to that conclusion. And I don't think it could provide one, because it never found out what was in the black box. You're right, Your Honor. So I'll be the first to admit that in the agency's initial notice and in the final decision, there's no reference to this material, either from DS or, you know, the underlying records from the T-status determination. If you wouldn't mind, I would like to explain why, nevertheless, remand would be inappropriate to try to get the agency's view as to that question. Remand would be inappropriate because the agency's reference to T-status comes as the third of three regulatory findings. And what the agency found was that assays, acts of omission, and commission had or, most importantly, could have had the effect of endangering Mismari. So the way the T-status was used in the agency's case follows. First, and you can see this on page 48 of the excerpts of record, the agency said, well, look, Mismari didn't have enough English. And second, the agency said, Mismari wasn't doing an actual training program. Mismari was actually, you know, flipping crepes in a kitchen. And that is sufficient to put her in an incredibly vulnerable position that could have had the effect of endangering her. And then the agency referred to the T-status, and it's, you know, the way it did so was to say, look, we're not crazy because another agency has said that maybe she, in fact, had been the victim of human trafficking. But whether she was or was not has no bearing whatsoever on the basis of the sanctions decision, which was, you know, whether Mismari was brought by fraud into the United States or whether Mismari was a willing participant in the fraud. That just doesn't have any legal significance to whether lack of oversight over its third parties could have put her in danger. Whether she was a trafficking victim or a participant, the department's position is that the lack of English and that this really wasn't a training program could have put anyone in that position in danger. Yes, Your Honor. And, you know, the reason we know that is, again, the agency says, and this is the carryover sentence on ER 48 over to ER 49, the inappropriate selection of Mismari and the failure to ensure Mismari's possession of sufficient English language skills had or could have had the effect of endangering Mismari's welfare. So, you know, it's true, as the other side points out, that the agency didn't further say, even if we weren't permitted to rely on the T-status determination by DHS, we would have reached the same outcome. But, you know, the APA doesn't require that degree of analytical precision from the agency. As the district court acknowledged, what is important is merely that the agency's path can reasonably be discerned. And here, you know, the vast majority of the sanctions order, if you take a look at it, Your Honor, it goes all the way from, you know, very detailed factual findings spanning several pages, none of which are contested any longer. The thrust of what the agency was talking about were, in fact, those independent regulatory violations. Okay. Well, fair enough. And maybe you're right about that. But how do you respond to counsel's, your opponent's argument that they say, listen, if you want to send it back and have the agency tell us that, okay, fine, we'll totally put aside any kind of trafficking, you know, the brand of you facilitated human trafficking on the company, and the allegations or the findings that it has not, it's now not even contesting are fully sufficient to support the letter of reprimand, why not just let the agency do that as opposed to, I think your opponent will say. Otherwise, we're sort of left with this stain on us that, for all we know, could be invoked later if any further problems come up in the future. So the other side's argument reads into the order a sanction that is not there and reasoning that is not there. So the sanctions order does not say assay is responsible for human trafficking. The sanctions order does not say, you know, assay allowed the human trafficking to occur, participated in the human trafficking or anything, right? So they are just simply wrong to characterize the order as saying that. What the order says is that assay had an obligation as a designated sponsor. It doesn't have to be in this business, but it had an obligation once it got into the business to make sure that people who entered the United States on the exchange visitor program, which was created to, you know, maintain friendly relations with other countries by making sure their citizens when they come here are not mistreated, fell down on the job and could have put Mizamari or people in the position of Mizamari in danger, right? And again, the reference... I was looking at, you referenced ER 48, but the concluding part of the agency's determination really begins around ER 49. Quote, in finding that ASSE committed acts of omission and commission which had or could have had the effect of endangering Mizamari's welfare, the office also relied upon the grant of T, non-immigrant status by the Department of Homeland Security. As stated in the notice, the department takes notice of the fact that DHS considers Mizamari to have shown sufficient evidence of human trafficking while participating in ASSE's exchange visitor program to merit T status. ASSE provided nothing in its statement to explain or rebut the fact. And it goes on. Most of that page, the penultimate page of the decision is devoted to the trafficking. So they clearly placed important reliance on this. At least you're right, they had a lot of other stuff as well. But they certainly viewed this as significant. The agency did view it as significant, Your Honor. But it bears underscoring what the agency thought it was significant for. So as I was saying earlier, the regulation that ASSE violated was that its actions... I see my time has expired. Please continue. The regulation that ASSE violated was that its actions could have put Mizamari at risk. And so the State Department indisputably found that. Now you're right, Your Honor, that the State Department went on to say... And by the way, we think actually according to the Department of Homeland Security and the grant of T status that human trafficking would have occurred. But that doesn't undermine the State Department's finding. And that's all the regulation requires, that Mizamari or people in Mizamari's position could have been put in danger. And that's ultimately what the sanctions order was about. Unless the Court is for the questions. No? Okay. Thank you very much, Counsel. Thank you very much. We ask that the judgment be affirmed. All right. Thank you very much. Let's put two minutes on the clock for rebuttal. Just to... Judge Rakoff, to amplify your point, not only did they do it in the final decision, but in the paragraph where it says,  First of all, the Department of Homeland Security does not intend to impose sanctions. It's much stronger at pages... In the excerpt of the record at 151, they say, as stated earlier, the Department is gravely concerned that a program sponsor could exercise such lack oversight that an individual on a designated program would be subject to treatment sufficient to warrant issuance of a T visa. And in the paragraph where it says proposed sanctions, it goes through that in great detail. So this isn't just another factor. And I think, Judge Bennett, to go to your point, yes, it is true that there are other factors here. But we don't really know if this factor is eliminated. And if they consider the evidence, remember the fraud here is Amari's fraud that she didn't speak English. We chose, for lots of reasons, not to get into those two other issues. But we would get into them if this case is remanded. For example, this is a woman who presented to us that she had 10 years of speaking English. She took four courses at a university where, in three of them, she got A's and B's in English. The facts that the government points to in its final sanctions decisions are actually things that occurred after we learned about her making claims. In other words, in February of 2012, they're that when she spoke to her, after everything came to our attention, that, yes, maybe she didn't have sufficient English. My only point is that if we go back on remand here, now knowing more than we do, and by the way, we didn't even get half of the discovery we requested. I mean, my sense is there's a lot more information in the Diplomatic Security's office and in the Department of State's office. If you notice, a lot of these documents are redacted. So I think if it is remanded back, we would at least have an opportunity to argue why we weren't involved in lax oversight in her English speaking when the visa office gave her the visa, when we had no idea that she knew that she didn't speak English and was working with a contractor, by the way, who wasn't even our third-party contractor, which, Judge Rakoff, goes to the point that you made about strict liability. They're imposing strict liability against us for somebody who wasn't even our contractor, Global Associates. We didn't even know about them. So it's hard to say even if you did impose strict liability, we should have it imposed in this case. And just one final thing. The government says the summary of the email correspondence at pages 252 and 253 are really what is the indication on Document 271. There's absolutely no foundation for that whatsoever. I know, Judge Watford, you asked, well, what other evidence is there about 271? That's just something the government's made up. The 252, from 252 to 271, there are emails going back and forth. Those emails aren't related to the final conclusion in 271. They just said that. There's no evidence in the record that that's just simply the view of one officer. That's what they're trying to say, that 252 and 253 is just the view of one officer. But the reality is it says that Headquarters reviewed this and made a determination. That's what Document 271 says.
judges: Watford, Rakoff, Bennett